CHASEZ, Judge.
This is an appeal from a judgment of the First City Court of New Orleans wherein the plaintiff, Mrs. Betty Deris, a femme sole, recovered the sum of $500.00 for damages found to have resulted from the presence of particles of glass in a banana split served to the plaintiff by the defendant, Finest Foods, Inc., d/b/a A & G Restaurants.
The defendant appeals solely from findings of fact resolved against it:
1. The finding of liability, and
2. That of quantum.
The contention is that in order to impose liability on the defendant, the Court must have decided that the plaintiff actually swallowed the glass in order to recover, and that the record does not. afford sufficient proof of this fact.
The facts appear clear to this Court. The plaintiff testified she had eaten a portion of her dessert when she bit into something hard. She swallowed a mouthful, assuming that what she had bitten into was a piece of ice, or a piece of nut-shell, or the like. The next mouthful pricked or scraped her tongue and she removed it from her mouth. She discovered a few small particles of glass. She summoned the waitress who had served her, who in turn summoned the manager of the restaurant. The manager came over to the plaintiff’s table, and from there he and the plaintiff went to a telephone to call her doctor. On the doctor’s recommendation to *414 her, the plaintiff obtained a piece of French bread at the restaurant and ate it.
Mrs. Deris testified as follows:
“Q. Then what happened ?
■ A. She brought the banana split and I guess I was half finished with it and I started to chew, I took a mouthful and started to chew it and something started to crack and I kept on chewing, thinking it was a piece of ice or a piece of pecan shell or something and I swallowed it. Then, the next mouthful I put in my mouth a piece of glass pierced my tongue, it pricked it, you know, and I got it out of the roof of my mouth and I took out about five (5) particles of glass.
Q. Were they large or small particles of glass?
A. I say one (1) or two (2) pieces were about the size of a half grain of rice.
Q. Just what did you do as a result of that?
A. I called the waitress, I told the waitress, she was standing not too far away, and then she called the Manager and he came over and I explained to him what happened.
Q. Is the Manager here in court today ?
Á. The Manager at A & G?
Q. Yes.
A. I think that’s the man over there but I can’t say definitely.”
(STIPULATION)
BY MR. EBERLE:
“It is stipulated between counsel that the Manager of the A & G Restaurant, Mr. William J. Langlois, is here present in court today.”
BY MR. EBERLE:
“Q. Now, let me go back just a little. Did you complain to the Manager first?
A. I complained to the waitress first. When she came over to the table I said, ‘there’s glass in this banana split’ and I showed it to her. She said, ‘wait a minute’ and then she went and got the Manager, she brought the Manager over to the table.
Q. That was the same girl that served you the banana split?
A. Yes.
Q. Did you show her the glass you took out of your mouth ?
A. Yes. I can remember he took the glass and he said, ‘What do you want to do?’ I said, T better call my doctor’ and then I came from the restaurant part to the cashier’s section where the telephone was and I called Doctor Brocato and I had to wait three (3) or four (4) minutes for him to answer the telephone and I was talking with the Manager and he was saying about his son being a doctor and I told him that was a good thing. I said, T have an appointment tomorrow with the doctor and if I wouldn’t be able to see him then I would be in a fix.’ I then spoke to the doctor and I told him what happened and he said to get some french bread and eat it and to see him tomorrow. I said, ‘I’m due there tomorrow. The Manager then brought me about a quarter of a piece of french bread and I began to eat it and then I went back to Cash Register Sales Company and I was terribly upset. I was on my way to school across the river, to Infant Jesus, to pick up my children and I was all upset and shaking. He told me to take *415 the nerve pill, which I had, and I had the french bread in one hand and a glass of water in the other hand. I took the nerve pill with the glass of water to calm myself down.
Q. Did you display the glass which you took out of your mouth to the manager ?
A. Yes, sir. I gave it to him.
Q. What statements were made by him at that time, if any ?
A. I was really upset. He said:
What do you want to do about it’?”
BY THE COURT:
Q. “He asked you what you wanted to do about it?”
A. “Yes, sir. I said, T better call my doctor’ and then he took me to the telephone to make the call.”
Mrs. Deris’ story is corroborated by a friend who was eating at the restaurant with her.
Mrs. Earline Moragne testified:
“O. Did you all go down there together?
A. No, sir, she went ahead. I couldn’t get away at the time. Then, I in turn, went down to the A & G and she was sitting at the counter when I got there and there wasn’t any room there at the time so I went over and sat at a table and I ordered a banana slipt from the wait-' ress and then by that time Betty came over and sat by me and when it came, she said, ‘Gee, that looks good, I think I’ll have one’, and she ordered a banana split.
Q. Was it the same waitress that had served you?
A. Yes, sir, with the banana split.
Was Mrs. Deris served with a banana split? p
Yes. >
Now, what, if anything, happened after that? o
A. I was eating mine and I had gotten about finished and Betty had her’s about half-way finished and she gave a funny face and I asked her what was wrong and she put a napkin to her mouth and when she did she took glass, out of her mouth, which I saw. She was very disturbed then because she felt she had swallowed a piece.
Q. Would you describe the glass that came out of her mouth? Was it large or small pieces ?
A. I would say they were small pieces, very small pieces.
Q. Approximately, how many would you estimate there were?
A. That’s hard to say because it has been so long. There were a couple of pieces I know but I really can’t tell you how many.
Q. Where did you see them ?
A. In her hand. She had taken them out of the napkin and fingered them and placed them in her hand. Then she called the waitress and the waitress in turn called the Manager of A & G.
Q. Do you see the Manager in Court this morning?
A. Yes, sir, that gentleman over there, sitting next to that other gentleman.
Q. You pointing to the gentleman sitting next to Mr. Brown, Mr. Lang-lois?
A. Yes, sir.
*416 O. What, if anything, did Mr. Lang-lois do or say?
A. Well, it was about at this point that I was ready to go back to work and, of course, I have a certain time for lunch so I had to get back. Mr. Langlois asked Betty what she wanted to do and then they both walked over towards the telephone and then I went and paid my b.ill and left.
O. Do' you know whether or not the particles of glass were shown or • displayed to Mr. Langlois, the Manager?
A. Yes, sir, they were..
Q. Were they also displayed to the waitress ?
A. Yes, sir.
Q. That was all in your presence?
A. Yes, sir, definitely.
Q. Do you know what became of those particles of glass?
A. Betty gave them to the Manager, Mr. Langlois.
Q.. Do you know what became of the remainder of the banana split?
A. No, sir.
Q. What effect did this incident' have on Mrs. Deris, that was discern-able to you?” ■
BY MR. BROWN:
“I object to that, - that calls' for a medical opinion.”
BY THE COURT:
“I will let it go to the effect.”
BY THE- WITNESS: ’
A. “She was very nervous and she was afraid that she had swallowed glass.
Q. Is there anything further that you know about this incident that happened before you went back to your place of employment?
A. Well, she was getting ready to get on the ’phone and call her doctor and that’s all I know because I paid my check and left.”
The only witness testifying on behalf of the defendant was the store manager; the waitress at the scene was not called to testify because her identity was not known, according to the manager’s testimony. The evidence given by the manager conflicts with the plaintiff’s on two scores; whether or not she displayed and turned over the glass particles to him, and whether she was visibly nervous or upset from the incident. However, the plaintiff was corroborated on these counts by her friend and her case in this respect was proved.
That glass was present in the plaintiff's mouth was conclusively established and the evidence preponderates to the effect that she actually did swallow some glass. There is nothing in the record to seriously controvert the plaintiff’s evidence in this regard.
The plaintiff’s doctor’s deposition was admitted into evidence by stipulation of the parties. He testified that it was his experience that a person may swallow small particles of glass without any direct physical harm resulting. In the absence of physical symptoms, the presence of glass appears difficult to detect, and an x-ray will be of no aid.
• This case is different from the case of Russo v. Louisiana Coca-Cola Bottling Co., 161 So. 909 (La.App.1935), in that the evidence in support of the claim that the plaintiff had swallowed glass was fraught with contradictions, and the claim was rendered éxtremely' doubtful. We find the evidence in this case to be of a more persuasive character.
*417 The following authorities are decisive of the issues involved herein:
“In cases of this type, the manufacturer and the vendor of food stuff designed for human consumption, both, are virtually insurers that such merchandise is pure, wholesome and free from foreign materials and deleterious substances.” Gilbert v. John Gendusa Bakery, Inc., La.App., 144 So.2d 760 (1962).
“Our jurisprudence has long been established to the effect that where food is sold at a public eating place to be consumed on the premises, the keeper of such a place is at fault if such articles prove to be unwholesome or deleterious because, in all cases, it is readily possible for him to know whether the quality of the ingredients or the articles of food into which they are transformed, is such as to render the product fresh and fit for human consumption.” Musso v. Picadilly Cafeterias, Inc., La.App., 178 So.2d 421 (1965).
“ ‘ * * * the seller of food stuffs is bound to warrant their wholesomeness and * * * everyone should know of the qualities of the things he manufactures and sells and that the lack of such knowledge is imputed to him as a fault rendering him liable to the purchaser for any vices or defects of the things.’ ” McAvin v. Morrison Cafeteria Company of Louisiana, La.App., 85 So.2d 63.
“Nevertheless, the restaurateur is not the absolute insurer of his customers. In order to recover from such a vendor, plaintiff must show the food in question was unwholesome, deleterious or contained a vice or defect.” Musso v. Picadilly Cafeterias, Inc., La.App., 178 So.2d 421 (1965).
“Under Louisiana law, the proprietor of a public eating place who serves a food fabricated by him and containing a for- . eign substance to a paying guest for immediate consumption on the premises is under an absolute liability for damages proximately resulting from the impurity, under the theory of an implied warranty of fitness.” Arnaud’s Restaurant v. Cotter, 212 F.2d 883, Certiorari denied, 348 U.S. 915, 75 S.Ct. 295, 99 L. Ed. 717.
Insofar as quantum is concerned, the award is modest. Fortunately, there was no apparent physical harm to Mrs. Deris, but the record indicates that a considerable amount of mental and emotional anxiety was occasioned by the defendant’s tort. The plaintiff visited her doctor the day after the occurrence, who testified to her fears. We aré not disposed to alter the award in favor of either party.
Aside from asking for an increase in the award, the plaintiff in her answer to the appeal prayed for damages for frivolous appeal. We do not find the appeal to be frivolous. The judgment is affirmed; the costs are taxed to the defendant-appellant.
Affirmed.